22, 20, uh, 2039, um, In Re Mexican Government Bonds Antitrust Litigation. Good morning and may it please the court. I'm Margaret McLean for the plaintiff's appellants. This is a simple case of whether there's personal jurisdiction over defendants who are selling a product into a forum, and the plaintiffs are bringing claims related to those transactions. That's the personal jurisdiction case that this court in Schwab 1 called easy. The only wrinkle at all is that the defendants were using affiliates, um, to help complete these transactions. But that too isn't really much of a wrinkle. As the court also said in Schwab 1, it's well established that a defendant can purposely avail itself of a forum by directing an agent or distributor to take action there. And that's exactly what happened here. Can I ask, if defendants sold, um, only through, um, broker dealers who are not affiliates, not corporately affiliated with the defendants, um, would there still be personal jurisdiction in New York? Or does your jurisdiction argument depend on, um, only using the New York affiliates? No, and I don't think it's relevant that they happen to be corporate affiliates. I think the result would be just the same if they were some third-party broker. That's not what the Supreme Court says with respect to industrial machinery. And they have that case, they have that specific case where a foreign, uh, uh, manufacturer sold allegedly defective machines that caused some guy to lose an arm in New Jersey. And the, uh, holding was, well, they just sold to a distributor. Uh, and the distributor is the one who sold the product into New Jersey, not the, the manufacturer. But that was an independent distributor. It was, but here, Your Honor, too, I would, I think it's also important to say this isn't a distributor. A distributor is an example of an agent that can be used as a type of agent, um, to purposely avail oneself of a foreign, but these here are not distributors. They don't have inventory. They don't have anything to sell if they wanted to. They don't have authority to set prices. Um, there, there's the, a complete clearinghouse, a pass-through, a completely passive stopover during the course of the transaction. So here you're saying the broker-dealers, there are factual allegations in the complaint that the broker-dealers function as the agents of the foreign entities, right? I am, Your Honor. And, uh, and, and for all of them, was there a corporate relationship between the broker-dealers and the foreign entities for all of the banks involved? Yes, Your Honor. Okay. And just a technical question. As to Citi, Bandamax, and BBVA, uh, Bancomer, there are some allegations that they, in at least some situations, transacted directly with plaintiffs in the form. Is that correct? That's in paragraphs 147 and 167, but I just had a question about that. We do have one record of Citi, or what appears in our trading records, that the plaintiff transacted directly with Citi Bandamax. I believe the defendants dispute that, or they say that it's not correct. But in any event, the general practice followed by all these defendants, including those two, at least the vast majority of the time, would be to use these third-party affiliates as a stopover for regulatory reasons. Was it exclusive, or were there other broker-dealers that the defendants used? And if so, then wouldn't your argument mean that there's personal intersection wherever broker-dealer they used in the business? It's not that each defendant does use a broker-dealer in New York, but it also uses certain other ones in its corporate family as well, but located elsewhere in the world. But I don't think it necessarily follows from there that there's personal jurisdiction wherever the broker-dealers are necessarily located, nor do we need to determine that. Well, I'm confused because the complaint relies an awful lot on sort of referring to trading and sales tests under the same corporate umbrella of a parent bank, global bank, and I'm trying to figure out how much work that that's doing in the relationship, and it sounds like your first answer was it's not. It doesn't matter to be any broker-dealer, in which case there would be jurisdiction anywhere, not just New York or through its affiliate. I think there would be jurisdiction specifically in New York because these defendants are reaching into New York and the United States to sell their product. They're creating a market for their product here in the United States. They're working with sales teams located in New York whose specific task is to develop a United States market. They're directing those sales teams to market their product. They're providing the specific pricing for the transactions, and they're doing so with the knowledge that that customer, the ultimate customer, is located in New York or the United States and with the desire that those customers be located in the United States. And so I'd say rather than just the simple location of the broker-dealer affiliate, I would say it's the defendant's efforts, again, to avail itself of the United States market, selling billions of dollars' worth of these bonds here in the United States that renders it subject to jurisdiction here in the United States, not just the physical location of the broker-dealer. That's one aspect of it. Each of these banks did use a broker-dealer that was located in New York, and that's just one more contact, one more attempt by the defendants to purposely avail themselves of the benefits of doing business through New York, but it's far from the only one. There are variations among the defendants in exactly how they use the affiliates. Is that correct? Not really, Your Honor. It's pretty much the same process for all. There's one situation, I think that involves Banco Mer, where the U.S. customer actually sends the cash to Mexico City, and Mexico City sends the bonds back to the customer. And I think the argument of the other side is, well, the customer was bound already by a contract with the broker-dealer, and so that's different, but that seems the most direct. Then there are others where there's a rather more elaborate set of maneuvers, such that the U.S. and this involves some other, Deutsche Bank, for example, or HSBC, where the customer never sends anything directly to Mexico, and Mexico never sends anything directly to the customer, but there are these sort of parallel maneuvers with the non-party affiliate that effectively mean that the money is being routed back to Mexico and the bonds are coming through the U.S. affiliate, but that's more indirect. So there are a variety of different procedures that are used. I don't know whether they make any difference, but some of them look pretty direct, and others look like schemes to avoid having direct contact. So I would say two things to that. First of all, I would say it's also important to realize there's kind of two affiliates or two types of affiliates or two types of agents that are working here. There's the sales team, and for each bank, that sales team is only located in the United States. The person that the customer is talking to to decide to enter into the transaction and to request the price and to ultimately decide, that is a United States person across the board. So that's on the one hand. As far as the transactions itself, in all cases, it is ultimately the defendant routing the bonds from Mexico to the customer. They call it a back-to-back transaction. So the defendant is sitting in its electronic system, and it's recording two transactions. It's recording one transaction from itself to the broker, and that broker might be located in New York or it might be located elsewhere, and then an immediate second transaction to send that bond on to the United States customer. Did that answer your question? I think so, yes. Okay, great. So Schwab says that plaintiff's claim must in some way arise from defendant's purposeful contact with the firm. And I guess I'm still struggling to understand how the New York component of this is arising from or the claim, which seems all Mexico-based, is arising from the New York conduct here. So I would say From the defendant's New York conduct, not the firm's. So two responses. First of all, is that now under Ford, we don't necessarily have that same strict causal relationship. All that we need is that the claim be related to the contacts ensued. So just to be clear, are you arguing that Ford abrogated that part of Schwab? That portion of it, to the extent it requires a causal relationship and no other type of relationship between the claim and the contact. But I would also say that it doesn't matter because we do have such a causal relationship here. This is a claim where the plaintiffs are claiming we're injured because we purchased price-fixed bonds to our detriment. And the transactions are the purchases. That is the means by which Well, from a third party. I mean, I know that you say that it's an affiliate, and it is, but it's also a different corporate entity. I would argue that the allegations in the complaint make it clear that the defendant is in fact the real party to that transaction. The broker-dealer, again, it doesn't own the bonds to sell. It's not doing the transaction. It doesn't have any authority in it. It's a stopover. It's more like an exchange, really, like a clearinghouse, where the true parties to the transaction are just being matched up by this third party. The third party isn't actually taking title to the bonds or owning them or distributing them in that classic sense. So in terms of the causal relationship question under Schwab, the Schwab court did permit the fraud by omission and some other claims to proceed. So just thinking about fraud by omission in the sense that Schwab thought of it, is that analogous to the claims asserted in this case in any way? And the fraud there, as I understood it, was that in selling the instruments there to customers, there was no disclosure that the LIBOR benchmark had been fixed. That was the omission. So is there anything similar in this case? There's even more similar. There were unjust enrichment claims in Schwab, and there's an unjust enrichment claim here. Just in terms of the theory of recovery, is there a similar theory of recovery that's asserted here to the fraud by omission or in the unjust enrichment sense? I would say yes, Your Honor. I would say certainly had there been a disclosure by the defendants that they had price fixed this bond, it would not have entered into that transaction. And do you think that's similar to the fraud by omission claim that was asserted in Schwab, or is there a difference? Have you looked into that? I don't really think there's a difference. Again, I've looked through. There were a number of common law claims in Schwab for which the court did find jurisdiction based on exactly this on the defendant's transaction. So in your mind, what's the difference between the fraud claim that was dismissed in Schwab and the remaining claims that were sustained? The fraud claim that was dismissed in Schwab was based solely on the defendant's live or manipulation in London. And that's the court's own word. But that's also, if you look at the actual piece of the complaint, I have it here. There's an A and a B in the fraud. And the fraud section A is fraud based on the live or submissions in London. And it says nothing further. There's nothing about anything else that happened after the defendants committed fraud in London. And, in fact, what the plaintiffs in Schwab wanted to use that claim for was to bring in defendants who had not transacted with the plaintiffs. Okay. Now, how is that different from the claims that you are asserting here? Here we have each of the defendants having transacted directly with the plaintiffs. We don't need to rely on the context of one to bring in the other. Does that add at all to your position that the role of the price fixing is different? I mean, in the LIBOR cases in Schwab, the banks are fixing LIBOR. They're fixing LIBOR for all kinds of reasons that are rather complicated and don't necessarily – they're not like we're setting the LIBOR price so that we can make more money on these sales in California. They were setting the LIBOR price for a whole variety of reasons, including looking like they were stronger than they were. And then there are ramifications because LIBOR is built into everything. Here you have a much more direct relationship, it seems to me, between the price fixing and the sale. The banks in Mexico are allegedly fixing the prices of the bonds that they are selling into the United States. In the LIBOR case, the banks were fixing a benchmark, which then turns up in products that the same defendants are selling directly into the United States. But there's not really that much of a connection. I mean they're fixing LIBOR on a day-by-day basis. Some of the allegations there were on a given day they might be fixing the price to go higher or to go lower because of what kinds of products they had already in the marketplace that were tied to LIBOR. And so on the next day there was going to be an adjustment, and so they wanted the price to move somewhere in that. That didn't have that much to do with what the price was of a given product that someone was hawking in California at the time. Here you have, according to your allegations, if I understand it, that this is pretty straightforward. They've got a product, they fix the price for it, and they sell it into the United States. Indirectly, and that may be an interesting issue, but they do it – that's what you're saying they're doing. 100% correct, Your Honor. I think that's a very relevant distinction. Even in Schwab where there were all those other reasons to fix LIBOR and it wasn't necessarily so directed, the court still found that there was personal jurisdiction for claims that related in some way to those transactions. Here the transactions are the heart of the claim. There's no purpose to the price fixing unless there's the transaction in the price fix bond. And so I'd say that's pretty much the most purposeful way that a defendant could avail itself of this forum, by reaching directly into it to sell its price products, whether using an affiliate or not. The transaction, again, is not just related but crucial. I think I'm way over my time. Thank you, Your Honor. You've reserved a couple minutes for rebuttal. Thank you. Mr. Berstein. Good morning, Your Honors. And may it please the Court, Boris Berstein from Skadden Arts representing the defendants. Your Honors, there's nothing that you heard today that justifies disturbing Judge Etkin's well-reasoned opinion dismissing these claims for lack of personal jurisdiction. Let me just make three things very, very clear about what's alleged here and what I don't believe is in any reasonable way disputed. All the alleged auction rigging and other anti-competitive conduct in this case occurred in Mexico. Second, no U.S. plaintiff alleges that it bought an affected bond from a defendant. There is this issue that Judge Subramanian asked about, about the one-city bond, which we can come back to. And third, the defendants have no branches or offices anywhere in the United States that sell Mexican government bonds. And with those facts in mind, this Court's holding in Schwab compels the dismissal of this case for lack of personal jurisdiction. Isn't this really not about Schwab or Ford? I mean, isn't this entirely about the intervention of the affiliates? In other words, suppose we had the exact same facts, except that plaintiffs in the United States who purchased the bonds purchased them by calling up someone in Mexico and saying, you know, I hear you have bonds for sale, or I hear from my broker in New York that you have bonds for sale. Yes. What's the price? Here's the price. Okay, I'll buy them. In that case, would there be impersonal jurisdiction? No. Because there you have the person reaching out. It's actually because of Schwab, Your Honor. Because remember, in Schwab, so Schwab deals with all sorts of categories of transactions, non-sellers, indirect sellers, and then direct sellers. So direct sellers in Schwab. And what does this Court then do? It said, okay, with respect to those, there is two types of allegations. For one, there is personal jurisdiction. For the other, there is not. There is personal jurisdiction for the following scenario. There is a direct transaction, and what the defendant does is issue an offering document to the plaintiff, says here's what I'm selling, and makes various representations, but omits a statement about that scenario. One, there is personal jurisdiction for that. And the second scenario is that there is alleged manipulation. There it's occurring in London. The price at which the contract settles is affected, and there's a direct transaction, but the manipulation occurs in London. The only thing that touches the forum is the phone call to which Your Honor just referred. Under those circumstances, Schwab holds there is no personal jurisdiction, and that's precisely the circumstances here. There is, to the question Judge Subramanian asked by Friends McLean, no analog to the omission allegation here. In fact, there are no communications at all alleged between the defendants, and it's important to note that. Again, that gets to the indirectness because, again, it seems to me that there is a difference. The prices of the bonds were not themselves fixed in Schwab. There was no conspiracy to fix the price of the bonds that Goldman was selling in California. There was a conspiracy to fix the benchmark, which becomes a whole different matter and much more indirectly related. Are you suggesting that if we're talking about television sets rather than bonds, and there's a conspiracy, the only television sets in the American market, something special, it's not a TV set, it's a product that's only made abroad, and all the foreign manufacturers get together and fix the price, and then they sell those widgets, machines, into the United States directly? No personal jurisdiction? There may not be personal jurisdiction, but there's a much easier answer to Your Honor's question, which is actually with respect to the relationship of conduct to the price, this case is actually worse for plaintiffs than LIBOR was. Let me explain why. So in LIBOR, remember, the court there, as Your Honor knows since you wrote the opinion, is addressing a direct transaction. So there's no indirectness issue for the thing I'm talking about. The direct transaction, and the transaction is a contract, which is like I pay you LIBOR or you pay me LIBOR, and the allegation is that the LIBOR is being manipulated. So there is a direct relationship between what's happening in London and the price at which the contract settles. Here, the relationship is, if anything, more remote. There's actually no allegation that there's any agreement at the price of the bonds. By the way, defendants aren't sellers of the bonds in a way, TV manufacturers. And also defendants are market makers. They're obligated to buy and sell bonds. They're just making a market in them. And so the allegation is that there's all this auction activity, which really has nothing to do with plaintiffs at all. And then there's an allegation that there is some agreement to widen the spreads. Now, an agreement to widen the spreads actually is distinct from a price-fixing agreement, that it's actually quite complicated to tell whether a particular price was affected by spread widening. So if anything, LIBOR, if we must get into the weeds of the conduct, is actually a situation where the conduct in London directly affected the price into the United States. Here, the alleged conduct in Mexico much more indirectly does so. But so you do have allegations in the complaint that there was a conspiracy to fix the price of these bonds for the purpose of inflating the price of these bonds for sale. So that's in paragraph 518 in the complaint. And then you have an allegation in paragraph 98 that there was a failure to disclose to the investors, including the plaintiffs, that when these sales were made, that they were being made at these artificially inflated prices. So how is that not similar to the fraud by omission claim? Or as you put it, the claim where there's something else, there's a direct linkage between the price-fixing and then the conduct that's directed towards the forum. Because, Your Honor, for there to be an omission, there has to be some sort of a communication from which the omission is made. There's no such concept as a freestanding omission. Here, so in LIBOR, and I can give Your Honor a cite. This is the LIBOR complaint, paragraphs 312 and 313, which are pages 877 of the joint appendix in LIBOR. What the plaintiffs allege there is that there's an offering document that goes directly from the defendant to the plaintiff that says, here's what I'm selling to you. And that document described LIBOR, and it doesn't describe it accurately. Here, there is no analog to that offering document. There's no communication at all of any kind. There are definitely communications. There's no centralized exchange for these bonds.  I understand that the plaintiffs relied on whoever was selling them their bonds, their broker, to provide them with a competitive price. But at the same time that they were relying on the brokers for a competitive price, they were not being told that the prices were actually artificially inflated as a result of this price-fixing conspiracy. So how does that not create a linkage there? I understand there may be no offering document alleged, but how is that not a linkage that would provide a hook for personal jurisdiction? Well, if there are communications alleged, Your Honor, they're not communications with the defendants. You mean they go through the affiliate? They go through a broker-dealer. There's no allegation that the defendant exercises any control over the communications that the broker-dealer engages in. And that's actually a very important point. And so help me with that, because Schwab does address this issue of agency and indicates that defendants can be held liable or can be subject to personal jurisdiction based on the actions of agents or distributors citing to Daimler. So what do we make of that in this context? So Your Honor will look pretty much in vain for an allegation of agency in the complaint or, frankly, in a briefing before Judge Etkin, with the exception of one footnote, which we can deal with with respect to a particular defendant. There's no mention of agency. Having litigated these cases a lot, I know plaintiffs know how to plead that somebody is an agent of somebody else when that's the argument they want to make. This is an argument made for this court and way below. So that's the first point. But moving on to the substance. Well, just to give you an example, paragraph 79, referring to the New York and Mexican desks being organized within the same internal division of the bank, each of the defendants structured its MGB trading and sales operations in this manner. Isn't that a factual allegation underlying an assertion of agency? I don't think so, Your Honor. So it may be that there is a North America division and it contains a broker-dealer in the U.S. and a bank in Mexico. So those are affiliates. They're organized in some sense under the same division. Maybe it's a fixed-income division as opposed to a geographic division. But they're separate legal entities. That's the point. They're organized under different laws. There's no allegation that there's some sort of a penetration of the corporate veil. And if you look at the cases that plaintiffs themselves rely on as examples of agency, so, for example, the Beale case from the Seventh Circuit, so what happens there is that the alleged principal tells the alleged agent, like, here's a script. When you want to talk to customers, here's what you read. And at some point, I'm going to dial into the call of the customer and I'm going to take over that transaction. Here, there are no factual allegations of control that the Mexican defendants exercise over the broker-dealers. The allegation essentially is that when some United States client, once in a very blue moon, shows up with a U.S. broker-dealer and says, you know what I want to invest in today? I want to invest in a Mexican government bond. What the broker-dealer does, broker-dealers in the U.S. don't hold those in inventory because where do Mexican government bonds live? They live in Mexico. So they call up a bank in Mexico, happens to be its affiliate, that's natural, and say, what do those go for today? And they go for 75. And so the broker-dealer purchases that bond for 75 and then it sells it to its client. There's no indicia there of any control by the Mexican bank of the U.S. broker-dealer. That sounds to me 100% correct if the broker-dealer that we're talking about is Merrill Lynch, right? No connection to the home company. And I guess it seems to me if we're talking about, say, Bank of America and Merrill Lynch, I would still think the same thing, that the brokerage operation has clients of a variety of sorts. It sells various sorts of things. It may sell some products that come from Bank of America, but it's not a captive broker-dealer. My understanding, and maybe this is incorrect, is that it was alleged that there were sales teams in the broker-dealers, that the broker-dealers had a project of trying to sell Mexican bonds in the United States on behalf of the banks in Mexico. Is that not what they're saying? Because I thought that's how I read their briefs. The broker-dealers in the U.S. have sales teams, and they'll sell whatever investors want to invest in or whatever investors want to sell back to them. And allegedly one of the products they sold was Mexican government bonds, but that doesn't make them agents. I mean, they sell all sorts of products. They're doing it all over the world. Yes, yes. This is just one part of the operation of a broker-dealer that happens to have an affiliation with a Mexican bank. Yes, it's certainly not alleged, nor is it conceivable, that the sales desk at all these banks in the broker-dealer sales desk in New York is just there to sell Mexican government bonds. I'm sure it sells U.K. government bonds or Euro bonds as well and whatnot. I see that I'm out of time, but I want to make sure that I've addressed any questions the Court may have about Ford. I could— Well, so let's talk about Ford. Let's talk about— So a different part of it. So there's reference to language from worldwide Volkswagen. So getting to this question about the indirectness of the transaction, Justice Kagan cites to this language from that case indicating that where a defendant has tried to service a market directly or indirectly, it can be hailed into court in that forum for defective merchandise, which was what was that issue there. So how do we think about that language in terms of the arguments you've made here? So the key there, Judge Subramanian, is that what the Supreme Court doesn't hold is that that's the only fact that's an allegation or an evidence, right? I think the key to Ford is that irrespective of where the person bought the Ford or where Ford committed whatever manufacturing error it did, Ford has so many connections to Minnesota and Montana that the specific jurisdiction to these Fords is appropriate. And so this is actually a point of— There's a point of agreement here between plaintiffs and me, which is that—and this is something they say at page 11 of their reply brief— that Ford is all about systematic advertising, servicing, and sales in the United States. And the problem for plaintiffs is that on each of those three prongs, in that bucket of other conduct that Justice Kagan focuses on in Ford, the plaintiffs fail. So servicing is the most obvious one. The Supreme Court is at pains in Ford to say, like, key allegation here is that Ford is relying on selling Ford parts as it maintains a continuous relationship with people living in Montana who drive Fords wherever they bought the Fords. And the Supreme Court then drops a footnote saying it would be very different if we're talking about somebody just selling into the Ford in a sporadic way. Here, there's no allegation of any continuous relationship in connection with selling a Mexican government bond. And I understand that. I guess I was speaking of a different part of Ford, which is that, citing the language from Worldwide Volkswagen, it seemed to be that the court did not think that there was legal significance as to whether the connections were direct or indirect, citing language from these prior cases. And so given that a lot of the discussion here has been about the use of these affiliates and the fact that these transactions went through these affiliates, doesn't that suggest that that distinction should not matter, given what we saw in Ford, just on that directness point? And just to follow up, what does that do to Schwab in terms of requiring some connection? Let me take those in turn. Just to remain to your question, I don't think the Supreme Court is saying that an indirect transaction is the same as a direct transaction, nor is it certainly saying that an indirect transaction is enough. What the Supreme Court is saying is that the indirectness of the transaction is not talismanic in the presence of the continuous relationship advertising,  which is why, unlike defendants here, Ford conceded purposeful availment in the Ford case. And then what does it do to Schwab? So there's a question that plaintiffs try to raise about whether Ford overrules Schwab, and I think there is a procedural reason and a substantive reason why this court shouldn't address it or should say it doesn't overrule Schwab. So let me go through the two of those. This case we have here today would only be an appropriate case to consider the question whether Ford overrules Schwab if Ford somehow changed the outcome of this case. So applying Ford to this case would lead to finding a personal jurisdiction, but that's not true because the thing that the Supreme Court focuses on in Ford, this continuous relationship, the direct advertising, et cetera, they're not met here. You're saying basically this falls into the category of where the Supreme Court says, let us tell you what our precedents mean. You shouldn't go deciding that the old law isn't good law anymore if it's not really direct. I mean, I don't want to say something banal, Your Honor, like Ford is about cars, in this case not about cars, but there's a reason that there are so many personal jurisdiction cases about cars and other defective products, and there are so many cases in the Second Circuit about bonds because they're different things and sometimes require some very different analysis. And the reason that even if the court wanted to think about the abstract question about whether Ford overrules Schwab, it would be a very odd question to ask is that they run on parallel doctrinal rails that don't really intersect. I mean, Judge Lynch didn't have before him in Schwab, because it wasn't alleged in the complaint, stuff about marketing and continuous relationship that the court is focused on in Ford. Yeah, but maybe, I mean, that is actually a question, though. Like what's the difference between selling an artificially inflated security into New York versus selling a defective car into Montana or wherever it ended up there? Well, so here there are sort of layers of difference. So the most obvious one is the one I already highlighted, which is that there is no continuous relationship. And there are actually financial products that do require a continuous relationship. This happens to not be one of them, and that's something that the Supreme Court was laser focused on. Then there's a question of direct marketing. So Ford spends a lot of direct efforts, as we all know from watching television, telling people in the United States, you should all drive Fords. Here, the marketing efforts that are alleged by defendants are in Mexico. They create reports. So Ford says in relation, relating to can be broad, but there has to be more of a substantial business presence to make up for that. Is that kind of your reading of it? Well, so we have to kind of go back to the factual situation that the court was dealing with in Ford. So the plaintiff lives in Montana and had an accident with a Ford in Montana and is trying to sue in Montana. But they happen to buy the Ford in North Dakota. And what Ford is saying is, well, it's a personal jurisdiction in North Dakota.  But everything else happens in Montana. And the Supreme Court says, no, no, no, there's nothing magical about where the transaction was because there's so many other connections that Ford has with Montana. And Montana is much more interested in this issue than North Dakota is. North Dakota doesn't care. North Dakota is just where somebody bought the car. Here, there's kind of a common sense due process intuition to the problem that the Supreme Court is trying to solve. Ford has so many connections with Montana related to this case, causally or not. The purchase place doesn't matter. Doesn't that then become a back question, whether the text messages about sales teams from Mexico visiting New York or things like that are enough? Oh, no, not at all. I mean, the text messages are not with the plaintiffs. It's certainly none of the plaintiffs here. And that's important. Well, they're to New York-based sales people. So I don't think they do. I mean, the text messages are kind of like the, you know, those text messages are not connected to the misconduct here. They're just like regular business. Well, now you're back to what Ford said isn't important anymore. I guess I see what you mean, Your Honor. I mean, it's not like Ford is looking at communications between, you know, Ford corporate and Ford in Montana. What the Supreme Court is saying in Ford is that Ford is reaching into the forum for customers directly through pervasive advertising, through relying on a continuous relationship. And, therefore, it's fair that it subject itself to the loss of that forum. On the other hand, in here, you know, all that, you know, when somebody contacts the Mexican bank and says, you know, are you interested in bonds or what's going on with Mexican government bonds today? The people at the Mexican government bond desk at the Mexican bank respond because that's what they do. They sell Mexican government bonds to all comers, whether it be from Tulsa or from Taiwan. And these are completely incomparable factual circumstances. I mean, Schwab perhaps incautiously realized pretty heavily on the arise from language. It was always, of course, the case before Ford. There was always, the language was always arise from or relate to. And the problem with relate to is everything relates to everything else at some level. And the question is how closely related is it? And I think having taught civil procedure around the time that Ford was happening, the Minnesota case in Ford was coming out of the Minnesota Supreme Court. My reaction was, my God, if the Supreme Court is going to say that doesn't relate to Minnesota, we're in real trouble. That's a really problematic kind of decision. And, indeed, they step back and say, well, this relates closely enough. So I think we're kind of really back at the level what you're arguing is, okay, it is relate to. That is reinvigorated by Ford. That's all true. Now the question is how closely does it relate? Does it relate so closely that it actually arises from? Does it relate so closely that it's pretty close to that, right? I mean the person who bought the Ford probably rather than a Chevy because they understood from the advertisement that Ford was cheaper, better, whatever. They just happened to buy it in a different state. It was sort of an accident that the accident happened in one state and the purchase was in another. So, I mean, I guess what the question is, it's not so much a question of does Ford somehow overrule Schwab, which does seem given how context dependent and, frankly, product dependent some of the Supreme Court cases seem to be. The question is just does this relate sufficiently to the wrongful conduct? And you're saying it isn't and they're saying it is. And that's kind of what we're about rather than some verbal formula. Yes, two thoughts on that, Your Honor. One, just to put your mind at ease, Schwab sometimes says the test in full, arise and relate to. I think it does on page 82. Sometimes it's focus on arising. When you quote the standard, you say both and perhaps incautiously and maybe out of fear that if one to relate to is getting a little shaky in the Supreme Court, you're focused on something else. But, yeah, the standard is stated in Schwab as arise from or relate to. And Your Honor didn't say there always has to be a causal connection, but there typically has to be a causal connection. And just to make one final point about Ford, I think in Ford there was a real concern about what is the forum that reasonably is most focused on this dispute. And here there's no question about whether such a forum exists. That forum is Mexico. Well, let me – I'm sorry. I know we've kept you a very long time. That's okay. And you sort of said I'd be willing to talk about this, but it's going to take a long time. But I'd like to understand better what actually happens here because I think you were resisting the notion that this is just like all the foreign manufacturers of some product get together and say we're going to sell that product at no lower than X price. And you said that this is not that. And so here's where it might be closer to, further from Schwab, whatever, because I think Schwab was not that really. So help me out in understanding what they fixed and how that relates to the price because I think I've been thinking about this as if these Mexican banks – they're not the creators of the bonds. The Mexican government is. But they're essentially like underwriters, it seemed to me. They control all the bonds now, and they're going to sell them. And I think you were suggesting to me that this is not like they all sat together and said we're going to sell these bonds at X price. What they fixed was something to do with an auction. And you were suggesting it sounded to me as if that is not the same as fixing the price. Am I right about that? Oh, for sure. Okay, so tell me why that is. Why is fixing the auction not the same thing as all agreeing that we're going to sell the bonds at this much of a discount or whatever? Sure. So the allegation is that there's – so these are – there's a primary market in which the banks buy the bonds from the government of Mexico. The counterparty there is the central bank in Mexico. No, that's the transaction. If there's some alleged information exchange that crosses a line, it affects the price at which the government of Mexico sells the bond to the primary – to the primary dealers. Right, which I think you'll agree will have some impact on the prices at which they can be sold because that changes the – what the banks paid for the bonds in the first place. I mean it could, but it could actually benefit the plaintiffs here. Yes, because if we got the bonds cheaper, we paid less to the Mexican government. We're cheating the Mexican government. Now we've got cheaper bonds. Precisely. And so that might actually lead to lower prices in the bond market in the United States. Right. And it also – are you saying also that does not mean that there's no competition among the banks? Of course. One bank could set one price and a different bank could set a different price at which they're selling to the U.S. customers. Oh, absolutely. Even on their allegations. So they do have an allegation, to be fair, about the secondary market. And that is an allegation that there is some sort of a spread widening conduct. The spread is a difference, as Your Honor is likely to know, between the buy price and the – so it's kind of like an Amex counter, you know, that changes currency. And so there is an allegation that there's some communication about the spread. Now, and the point I was trying to make to Your Honor is that there is an indirect connection. There could be a connection between a spread and a price, but that connection could be indirect. So, for example, you know, let's say the spread – the competitive spread is one. So we buy at 74 and we sell at 75. And now there's an agreement to widen it to two. It could mean that we buy at 74 and sell at 76. It could mean we buy at 75 and sell at 73. And depending on whether the counterparty is on one side of the transaction or the other, its price may be affected or it may not be affected. So in that sense, the causation chain here is actually somewhat more indirect than in Libor. All right. But there are still two different conspiracies, it seems to me. If the conspiracy is that we are going to get together and fix the auction so that no one is going to bid high on what they're buying from the Mexican government at, it's hard to see how that hurts the U.S. customer. And it's hard to see because presumably they're now getting their inventory cheaper than they would have gotten it elsewhere, which might lower the price. And it also seems that that is rather indirectly related to whatever the pricing is going to be because we're still free to compete with – we, the Mexican banks, are still free to compete with each other. And some might take less of a spread than the other. Okay. If that's what's going on and that's all they've alleged, then it seems to me that there is not a very strong relationship. It's not just that the harm doesn't arise from – it's a little hard to see how it relates except in a very generalized way to the fact that the topic is Mexican bonds. I think I'm with you that far. But if you're saying they've also got an allegation in there that after they fixed the price for Mexico to buy cheap, they then agreed on what the spread is going to be on what they sell into the United States. Now you've got something that is different and is much more directly related to the sale. And that's where we get into the question of are they selling directly into the United States or indirectly into the United States and whatever else. But I think all those relationships with the affiliates are kind of irrelevant to the relationship between the auction price fixing and the harm to the United States and what's happening in the sales in the United States. But now you're saying actually, although that may have been the primary wrongdoing and the thing that's most proven and the thing that the Mexican government got all upset about, they actually do allege that the banks conspire on what they're going to – what the spread is going to be between what they bought from the Mexican government and what their selling price is. No, no, no, not that spread. Not that spread. So think about a market maker. Forget the Mexican government for a second. Just assume it's some kind of a corporate bond that's been outstanding for a long time. They just buy and sell. And there's an allegation that there's communication about the difference between the buy and the sell price, not the spread to the auction, at least as I understand plaintiff's allegations. The spread between what they bought the bond for and what they're going to sell it to their customers for. That's right. Your Honor, I'm not – I – there's – And you're fixing your profit margin. The competitors are fixing what profit margin they're getting, right? That's – the thing is, Your Honor, that's – I don't disagree with you that those are two – potentially two different plans. That doesn't help plaintiffs because both of those plans land on the same side of Schwab. That's really the problem. Your Honor said in Schwab, sure, they profit from changes in LIBOR because they write LIBOR instruments. That doesn't cut it. That's the issue. And the relationship between the allegedly manipulated price and what the U.S. plaintiff was charged was, if anything, more direct in Schwab than it is here. Isn't it a little different here? So looking at paragraph 518, that paragraph says that one of the purposes of the conspiracy was to generate unlawful profits on the MGB transactions. And one of the ways in which they would do that, as we've discussed, is to fix the bid-ask spread artificially wider in MGB transactions with plaintiffs and class members. So taking those two things, doesn't that make it the kind of – more analogous to the selling of a handbag or something else to a buyer in the forum? But all those things were alleged in Schwab, and none of them cut it. Yeah, but that's because it wasn't plausible in Schwab because the conspiracy was not to jack up LIBOR so that when you had a LIBOR-denominated bond, it would come with a higher rate of interest. The conspiracies over LIBOR were much more episodic and involved what was happening in the London marketplace at that particular moment. It wasn't really that there was a generalized conspiracy to jack up LIBOR and then they were going to sell LIBOR-denominated bonds and get a higher rate of interest in it. That wasn't what was happening. Well, that was precisely the source of damages that Charles Schwab allegedly suffered. And I think there were sort of two sets of alleged reasons that LIBOR was being manipulated. One had to do with actually benefiting transactions, and another had to do with the kind of financial stability. And this court didn't distinguish in its personal jurisdiction holding between the outcome as to one and outcome to the other, as it very carefully did as to all the other permutations of facts. What about unjust enrichment? So in Schwab, unjust enrichment claim sustained. Here, unjust enrichment claim is alleged. So putting the Sherman Act claim to the side, what about unjust enrichment? The same claim was at issue in Schwab. So the court wasn't focused on what the label of the claim is. Here, it's impossible to distinguish between an unjust enrichment and a Sherman Act claim because the facts alleged are identical. And that's what the court was focused on in Schwab. What is the nature? The plaintiff here says that in Schwab, the factual predicate for all the claims was the same. And so the only difference was that for the fraud claim that was dismissed, it had no tether to transactions. Because as counsel mentioned, it applied whether the defendants had sold anything to the plaintiffs or not. But other than that, the factual predicate was the same. So applying that here, how do we think about the unjust enrichment claim? So that may be true, that there was the same factual predicate. My short answer is that doesn't change my argument. Let me explain why. Here, the only factual predicate behind all the claims is the alleged manipulation in Mexico. That's the misconduct. In Schwab, there were two factual predicates underlying all of the claims. One was alleged manipulation in London. And the other was the omissions from the offering documents in the paragraphs I cited to your honor before. And so what this court did is preserve the latter, which are not present here, and say that there's no personal jurisdiction as to the former. Here we just have the former, thus no personal jurisdiction. Unless the court has any questions, I may have exhausted your patience. Thank you, counsel. We'll move on. I think you're reserved three minutes. Okay, just a few points. I know we've all been here a long time. But first of all, to Judge Lynch's point, we absolutely have allegations here of plain Jane price fixing. It is true that the defendants had a separate conspiracy to profit by fixing the auction, but that's not what we're claiming for here. That's not how we're claiming we were damaged. For example, paragraph 444 of the Second Amendment complaint, JA 432, defendants profited from the conspiracy by agreeing to sell MGBs following the auction at fixed, artificially higher prices. And I could point you to, for example, JA 419. I would read them aloud, but they're under a seal. But it's chats that you can read that are absolutely plain price fixing. So we are dealing with that kind of conduct in addition to the auction conduct. That's number one. Number two, at the beginning of counsel's argument, we were talking a lot about control. And I think it's important in the context of agency. I think it's important to distinguish. We're not talking about control in a veil-piercing sense, control of the affiliate as an entity or some kind of blurring of the corporate boundaries. We're talking about control over that transaction in which they're acting as an agent. And in that sense, the complaint is replete with allegations of control, that the affiliate had no authority to set prices, that it had no inventory to convey, that it had no real active role whatsoever in the transaction and was only acting at the specific direction on a transaction-by-transaction basis of the defendant in Mexico. And that's the type of control that we're talking about here for purposes of them acting as an agent. But that would be true of Merrill Lynch as well, right? I mean, if it was a totally unaffiliated broker-dealer, they would still not have the ability to set the price at which they could get the bonds anyway. I think that's going back to Judge Park's original question where he had asked, does it matter that they are affiliates? And I don't know that it does. I think that they would be acting as an agent for that transaction, such that you could consider that the defendant itself was reaching into the floor and it was just using this broker to do so. And again, agency two in the context of purposeful availment is not, I wish it had a different label because it's not the same test as agency more generally, a formal agency relationship, say, to enter a contract or do something else. This is laid out in the Spetna versus Palestine Investment Bank case, and I believe in Schwab as well. We're just talking about knowledge, benefit, some control. Not total control, just some type of control. And that's all we're looking at. We absolutely have allegations, factual allegations that support that. I also wanted to touch a bit on the discussion about the systematic business in Ford and then counsel's attempt to distinguish what we have here. We absolutely have allegations of systematic business in this country. We have allegations of hundreds of billions of dollars worth of transactions being done over a class period of years. Even if we just look at the appendix of the complaint that has plaintiff's own traits, just these eight named plaintiff's own entities, there's over 300 of them. For example, if you look at the Chloe versus Queen Bee case out of this court, there were 52 handbags sent into New York, and that was considered a substantial connection, doing substantial business. We're far, far afield of that. Yes, it's always possible to have more context, for instance. You could always say that some other company, such as Ford, has even more systematic or even more extensive context, but the question is whether the context we've alleged here are sufficient, whether they constitute purposeful availment, minimum context, and they're much more than minimum context, and they're very clearly purposeful availment. Sorry, just a quick question. Is that just wherever Mexican bonds end up in the hands of investors, that's a sufficient business connection? Your Honor, no, I would not say that they're ending up in the hands of investors. I would say they're being sent to the hands of specific investors, specifically, with the intent to sell them in New York. Can you explain that? Two ways. First of all, we have the defendants working with their sales teams that are located in New York that are specifically tasked with marketing to the United States market. These are all global banks. There are affiliates elsewhere. This is going back to my first question. You just said defendant sales teams in New York. I thought that wasn't a thing. There are two different things. There's the sales teams that are all in New York, and then there are the broker-dealer affiliates, which are some in New York and some not in New York. So the Mexican defendants have sales teams in New York? Yes. They're based in New York? Yes. And they sell in New York? Yes. And they work for whom? No, they work for affiliated entities. But, no, they're not employed by the defendants. But I'm saying the defendants are using these sales teams to market. They're choosing to work with those sales teams because their area is the United States, because that is the area that they want to target with their bonds. Okay, I understand. I think I'm over my time. Did the court have any other questions? You can finish your conclusion. Just one last thing. So look at the district court's opinion. It's found no personal jurisdiction based on this notion that the context had to cause the misconduct, that the defendant's conduct with the forum had to cause the defendant's wrongdoing. It's simply not correct. It's certainly not correct under Ford, as we know now, where the design and the manufacture of the defective car indisputably happened outside the forum. It didn't matter. It wasn't true under Schwab, even, where the district court had found that only the location of the live or manipulation was the proper forum for personal jurisdiction. And this court described that rationale as erroneous. And so I would say that the decision must be vacated and remanded. Thank you, counsel. Thank you both. We'll take the case under advisement.